# Hepworth *v.* Henshall, Appellant.

[Marked to be reported.]

*Equity—Specific performance—Assignment of patent.*

A court of equity will enforce an agreement to assign a patent by a decree for specific performance.

*Agreement to assign patent—Partnership—Responsive answer—Evidence.*

On a bill to compel an assignment of a half interest in a patent, plaintiff alleged that, in consideration of his admitting defendant into a half

interest in his business defendant agreed to assign to him one half interest in a machine, and in the letters patent that should be granted for the machine, and for improvements upon it.   Defendant denied that any such agreement had been made.   The master found that plaintiff's testimony was corroborated by the fact that defendant was allowed, without objection by plaintiff, to use the firm's money, property, employees' time and room space, and also his own time, for the purpose of perfecting the machine, and securing patents for it.   It also appeared that when foreign patents were taken out on the machine, plaintiff was allowed to participate in them without any question being raised as to his right of ownership.   A number of witnesses testified that they always understood that the machine belonged to the firm.   Defendant and wife contradicted the testimony of plaintiff, and a number of witnesses for defendant stated that they understood that the machine belonged to him.   The master found as a fact that the agreement set forth in the bill had been made.   *Held,* that the evidence was sufficient to sustain the master's finding.

*Improvements at termination of partnership—Modification of decree.*

In above case the court below entered a decree ordering defendant to assign a one half interest in the machine and patents and in all improvements and patents which might thereafter be granted for improvements. *Held,* that the decree should be modified so as to except improvements made after the termination of the partnership.

*Evidence—Cross-examination—Impeaching veracity of witness.*

It seems that where a witness has testified in his examination in chief that he would not believe another under oath, and that he based his opinion upon the person's general reputation for veracity, the witness may on cross-examination be questioned as to his business and social relations with the person whose veracity is impeached, in order to show bias.

Argued Jan. 19, 1893.   Appeal, No. 9, Jan. T., 1893, by defendant, Samuel Henshall, from decree of C. P. No. 2, Phila. Co., Dec. T., 1890, No. 849, compelling assignment of half interest in patent to plaintiff, John W. Hepworth.   Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, McCOLLUM, MITCHELL and DEAN, JJ.

Bill in equity to compel assignment of interest in patent.

The case was referred to Albert B. Weimer, Esq., as master, who, after stating the pleadings as recited in the opinion of the Supreme Court, reported as follows:

"3. Nature of the issue:

"It is important at the outset to determine precisely the nature of the issue raised by the pleadings in the case.   Defendant's counsel argued the case largely on the theory that the bill was intended to vary a written agreement by parol evi-

dence of a contemporaneous oral agreement. Plaintiff's counsel, however, contended that the bill simply sought to enforce an oral agreement to assign a one half interest in a patent, the consideration for the oral agreement being the execution by the plaintiff of the partnership articles, and that the two agreements were collateral to each other, and that the oral agreement was in no way intended to modify or change the partnership articles. The importance of the distinction lies in the fact that the quantum of proof required in the first instance would be greater than that required in the second. The difficulty lies not so much in the averments of the bill as in the condition of the proofs. The bill avers : ' It was orally agreed between the plaintiff and the defendant, in consideration of entering into said articles of agreement and in consideration of other matters, that the plaintiff should be the owner of one-half interest in said machine, and in the letters patent which should be granted therefor.' These words seem clearly to imply that the execution of the written articles was merely a consideration for the agreement to assign one half the patent. [The plaintiff's testimony, in the main, supports the words of the bill.] [1]   He says : ' Seeing Mr. Henshall frequently, and believing that this was a pretty good machine he was working on, I made this proposal to him : That in case I can succeed in raising enough money to buy out both my partners, I have a proposal to make to you. He says : "What is it?" I says : " I will give you half the business for half your machine." He said : "It is a go." I said : "All right." ' The plaintiff also testified that William Hill, who was preparing the agreement, came to him and said: ' "Well, John, look here about this agreement, what is Henshall going to put as an equivalent to your capital?" I says : " Why, I am getting half this machine." Henshall spoke up and says : " Yes, I have got no money, and, of course, I am giving John half this machine for half his business." ' On cross-examination the plaintiff was asked this question, relating to matters just prior to the bringing of the suit : ' Q. Before you became dissatisfied, then you found fault with your partnership agreement, did you? A. No ; I did not find fault with the partnership agreement. I only asked him to put up his half of the agreement, and he did not choose to do it.   Q. At the time the verbal contract

was made, you say you were to have one half of this machine in consideration of going into partnership with Mr. Henshall; that is right, is it? A. Not exactly. You are getting a little out of the road. I was to have one half of the mach ne for taking him in partnership with me. This is the way. I had the business. Q. Why do you say to me that Mr. Henshall has no right to the partnership? A. Because he has not put up the part he was to put up to get the partnership. Q. What do you mean by that? A. He promised to give me one half of the machine. Q. According to your understanding that he has no right to the partnership, it is because he has not assigned you one half of that machine, which is now in controversy; is that it? A. Certainly.'

" On the other hand, the plaintiff, in his cross-examination, stated that he considered the machine as belonging to the firm. There was also an account in the firm books against the machine, and a number of firm checks were drawn to pay expenses connected with it. It must be remembered, however, that the firm consisted only of Hepworth and Henshall, and, if the plaintiff's story is true as to the oral agreement, it is not particularly strange that no distinction was made between property actually in the business, and that which was owned in common by the two partners. [Assuming the plaintiff's testimony to be true, it seems to be reasonably certain that the real contract between the parties was that the defendant should assign to the plaintiff one half interest in plaintiff's business, and that everything was put into the partnership articles that the parties intended.] [4]

" 4. Quantum of proof.

" If it be conceded that the bill in this case is intended merely to enforce an agreement to assign a one-half interest in the patent, the plaintiff must overcome the responsive denial of the answer by the testimony of two credible witnesses, or by one witness, corroborated by other circumstances and facts which are equivalent in weight to a second witness: Story's Equity Jurisprudence, § 1528; Horton's Appeal, 13 Pa. 67. While the evidence must be such as to satisfy the conscience of a chancellor that the plaintiff is telling the truth, it does not seem necessary to exact such a rigid measure of proof as is required to contradict or vary the terms of a written in-

strument—such a rule, for instance, as is laid down in Thomas v. Loose, 114 Pa. 35; Phillips v. Meiley, 106 Pa. 536; Spencer v. Colt, 89 Pa. 314, and kindred cases. In this case the plaintiff has offered to establish the averments of his bill by his own testimony, by that of William Hill and by certain circumstances which tend to corroborate the testimony of himself and Hill. The defendant, on the other hand, has, by his own testimony, denied the facts alleged by the plaintiff and Hill. He has also seriously impeached the veracity of Hill, and has offered in evidence certain circumstances, which, he claims, tend to prove his side of the case. Over one thousand pages of testimony were taken. Some of it is wholly irrelevant to the issue, and much of it is absolutely contradictory. The plaintiff tells one story and the defendant contradicts it and tells another wholly inconsistent with the former. In such a condition of the evidence, the only way to ascertain the truth as to the one fact in issue in the case is to carefully marshal the evidence on one side against that on the other; to weigh the inherent probabilities of the conflicting stories, and to consider with due caution the credibility of the witnesses. In such a case, it is due to both parties that the master should not simply state his conclusions, but should set forth fully the processes and reasoning by which he reached them.

" 5. Plaintiff's proof.

" (*a*) Hepworth's testimony. The plaintiff, by his own testimony, supported all of the main averments of the bill. In his story there was no improbable elements, and he did not contradict himself. He was subjected to a cross-examination which covers eighty-five pages of the record of testimony, and he was in no way shaken in the evidence which he gave in his examination in chief. An attempt was made to impeach his veracity by showing that a statement which he made on cross-examination was untrue. He was asked on cross-examination by defendant's counsel whether he had engaged in any other business during the continuance of the partnership, and in violation of the partnership articles. He replied that he had not. The defendant subsequently offered a witness to prove that the plaintiff had actually been engaged in the bicycle business. The offer was refused on the ground that the evidence as to the breach of the partnership article was irrelevant, and that

an offer to contradict statements made by a witness on cross-examination as to collateral matters is improper. Evidence that the plaintiff engaged in another business would have been proper in an accounting between the partners, but it was clearly irrelevant to the present case. In Fry on Specific Performance, 2d ed., § 917, the rule is stated as follows: 'Where that, on the nonperformance of which by the plaintiff the defendant relies, is in its nature a collateral and separate contract, though between the same parties and entered into at the same time, and having relation to the same subject-matter as to the contract which the plaintiff seeks to enforce, the court will not consider the default by the plaintiff in respect of the one contract as any bar to the specific performance of the other, though such default may give the defendant a cross right of action on legal or equitable grounds.' If it be conceded that the evidence offered was irrelevant, it was improper to attempt to impeach the plaintiff's veracity by the use of it. In Greenleaf on Evidence, 14th ed., § 449, it is said: 'It is a well settled rule that a witness cannot be cross-examined as to any fact which is collateral and irrelevant to the issue, merely for the purpose of contradicting him by other evidence, if he should deny it, thereby to discredit his testimony. And, if a question is put to a witness which is collateral or irrelevant to the issue, his answer cannot be contradicted by the party who asked the question, but it is conclusive against him.' See also to the same effect: Griffith v. Eshelman, 4 Watts, 51, 53; Elliott v. Boyles, 31 Pa. 65, 67; Wright v. Cumpstry, 41 Pa. 102, 110; Gaines v. Com., 50 Pa. 319, 325; Hildeburn v. Curran, 65 Pa. 59, 63; Hester v. Com., 85 Pa. 139, 157. The plaintiff's evidence as to the terms of his agreement with the defendant is contradicted by Mrs. Henshall, the wife of the defendant, but, for reasons hereafter stated, the evidence of this witness must be taken with great caution.

" (b) Testimony of William Hill. The plaintiff relied upon William Hill as the second witness necessary to establish his case against the sworn answer. The master, however, is of the opinion that the character of this witness for veracity is so seriously impeached that his testimony cannot be given the weight claimed for it. Twenty-eight witnesses testified that they were acquainted with his general reputation for veracity in the neigh-

borhood where he did business or resided, and that that reputation was bad. They also testified that they could not believe him under oath. On cross-examination thirty-two persons were named as sources from which the witnesses obtained their information, but nearly all of the witnesses stated that they heard of Hill's bad reputation for veracity, not only from the persons whom they named, but also from persons whom they could not recollect or whom they could not name. Eleven of the thirty-two persons named as sources of information were also witnesses. Five persons who were named as sources of information appeared before the master and contradicted the alleged statements and testified that they would believe him under oath. Nineteen witnesses testified that they would believe Hill under oath, but it appeared, on cross-examination, that most of them based their opinion as to his veracity, not on his general reputation, but upon their personal relations with him. The master is clearly of the opinion that Hill's reputation for veracity is bad, and that his testimony should not be given much weight; certainly not the weight of a second witness to sustain a bill against a sworn responsive answer. His testimony, however, as it was presented, corroborates plaintiff's testimony, and is itself corroborated by the circumstances which tend to confirm the plaintiff's story and by the probabilities of the case. Under these circumstances [it might possibly be given a slight weight as an additional corroborating circumstance in favor of the plaintiff.] [8]

" (c) Corroborating circumstances favoring the plaintiff.

" (1) Improbability of the partnership agreement having been without a consideration. The articles of copartnership contained a provision that in consideration of the skill, knowledge and experience of the defendant as a machinist, he should have an undivided one-half interest and ownership in all the goods, wares, debts and property delivered as stock to the firm by the plaintiff. The actual net capital put into the firm by the plaintiff was $11,000. Each of the partners was credited on the books of the firm with $5,500. Henshall was a good mechanic, but he had no special knowledge of ' Loopers ' and ' Balmorals,' which machines were the principal products of the firm's factory. The plaintiff was also a mechanic and had practical knowledge of the making of the machines manufactured by the firm.

" The plaintiff claims that it is highly improbable, if not incredible, that he should have agreed to give to Henshall so large a sum as $5,500, under a partnership agreement which might have terminated in a very short time by a quarrel between the partners, or by the death of one or the other of them. The master cannot but think that if the plaintiff entered into such an agreement for no other consideration than for the help which he was to receive from the defendant, he ran a serious risk, and did a very foolish thing. It is true that Mr. Beatty testifies that the plaintiff was very anxious to get rid of his old partners, who were apparently worthless, and to obtain some one who could adequately help him in the practical part of his business; and it also appears from the evidence that the new firm was fairly prosperous during the whole of its existence. [Such an agreement, however, seems improbable, and its improbability must count as a circumstance corroborating the plaintiff's testimony.] [9]

" (2) Use of firm's room for the seamless machine.

" A few months after the partnership was entered into, the defendant moved the machine or machines which he had made at his house into a small room opening into the factory, a part of the leased premises of the firm. After the first and second machines were abandoned the defendant began the erection of the third machine in this room. He did all of his work on the machine in this room, and it seems to have been generally known in the factory as the automatic room. The plaintiff never made any objection to the use of the room for the purpose to which it was put.

" (3) Use of defendant's time on the seamless machine.

" After the seamless machines were removed to the so-called automatic room, the defendant spent a large part of his time in this room, presumably working on the machine. Some of the witnesses stated he was there half of his time. The defendant himself could not say how much time he spent there, except that it did not amount to five thousand hours, as one of the witnesses had stated. A number of the employees, who testified on behalf of the plaintiff, stated that the business was neglected, and that the shop was practically run by the workmen. This testimony, however, was contradicted by a number of witnesses for the defendant, who testified that

the shop was well managed and the work not neglected. However this may be, it is affirmatively shown and practically conceded that the defendant did spend a very considerable portion of his time during business hours in working upon the seamless machine. If the plaintiff had no interest whatever in the machine, and it was the defendant's sole and exclusive property, it seems remarkable that the plaintiff should have never in any way objected to the defendant using his time as he did; and it seems even more remarkable, in view of the defendant's statement that at the very beginning of negotiations concerning the partnership he had expressly stipulated that the seamless machine was not to be considered in the transaction.

" The plaintiff could have very well objected that the defendant was not devoting a proper portion of his time, thought and energy to the business, and that, in so doing, he was expressly violating the seventh clause of the partnership articles, which forbade either party from engaging in 'any other art, trade or business to his private benefit and advantage.' The only reasonable way in which the plaintiff's silence can be explained is that he regarded the machine as the joint property of himself and the defendant.

"(4) Use of firm's workmen on the seamless machine.

" It is not denied that the employees of the firm were employed for making the various parts of the second and third machines, and that they spent a large amount of time in so doing. One witness testified that he spent five or six months altogether; another that he spent five or six days; another worked for three months on the machines; another man worked for about one month; another six weeks; another five or six weeks; another for about five weeks. For a considerable time no record was kept of the time thus spent. Subsequently, however, and after the third machine was begun, the men were instructed to mark their time upon the patterns. The plaintiff testified that this was done so that the cost of building the machine might be ascertained. The defendant claimed that he expected to pay for his work, and that he supposed that it was all charged to his private account in the firm books. He also testified that he was not aware that his account had not been so charged, and he stated that he never examined the books and knew nothing of their contents. In this last statement,

however, he is directly contradicted by Mr. Winkler, the book-keeper. The plaintiff never made any objection to the men being employed upon the seamless machines, and never instructed the bookkeeper to charge such work against the defendant's private account; nor did he ever make any demand upon the defendant to be reimbursed for his portion of the wages thus spent. If there had been no joint ownership in the machine it seems to the last degree improbable that the plaintiff would have permitted such work to go on without having interfered to protect himself from loss.

" (5) Use of firm's money for patents, etc.

" A number of checks were offered in evidence, showing payments to Howson & Sons and G. Morgan Eldridge, patent attorneys, and also one check to Thomas J. Hunter, a pattern maker. All these checks were drawn in the form provided for in the partnership articles by John W. Hepworth & Co. to the order of Samuel Henshall. Each of them was indorsed by Samuel Henshall to the order of the person for whom the payment was intended. The firm name was written by John W. Hepworth. It was not denied that the checks were drawn for the payment of fees for procuring patents for the seamless machine, or for making patterns for the machine. Various bills offered in evidence, and attached to the checks, show that the checks were drawn for these purposes. It appears from the books that the amounts of the checks were all charged to the expense account of the firm. The defendant claims that he expected to pay these expenditures out of his individual funds, and that he supposed that they were charged to his private account, but it does not appear, even from his own testimony, that he made any serious attempt to have them so charged. The plaintiff drew the checks and directed Mr. Winkler, the bookkeeper, to charge them to the firm's expense account. He knew that they were not charged to the defendant's private account, and, of course, made no objection to the expenditure of the firm's money for this purpose. In so doing he must have been a more foolish man than the other evidence in the case discloses him to be, or he was acting on the supposition that he had a joint ownership in the patents for which the payments were made.

" (6) Settlement of the Bishop suit.

" Prior to the partnership between the plaintiff and defendant, the defendant had relations with one Bishop, who had advanced to him a considerable sum of money on account of the seamless knitting machine. After the business was begun under the partnership agreement, Bishop brought suit against Henshall and recovered a judgment for the amount of his claim. The judgment was paid by the firm and charged as a firm expense. The plaintiff stated that the reason he had agreed to pay the judgment out of the firm's moneys was owing to the fact that he had a half interest in the machine, and that the money for which the judgment was recovered had gone into the machine. This explanation seems probable, since there is no other reason to be found in the testimony why the plaintiff should have paid one half of a private debt of the defendant.

" (7) Plaintiff's one third interest in the foreign patents.

" Some time in 1888 arrangements were made to take out patents on the seamless machine in England, France and Germany. These patents were issued in the name of Samuel Henshall, John Wesley Hepworth and Joseph Hanson. Joseph Hanson paid all of the expenses in procuring the foreign patents, in consideration of which he received a one third interest in them. If it be assumed that Hepworth had no interest whatever in the seamless machine, there is no reason disclosed by the evidence why his name should have been inserted in the foreign patents. He paid no portion of the costs of procuring the patents. There is no evidence that he bought any interest from Henshall, and there was no agreement with Henshall by reason of which he should have a one third interest. The only way in which this circumstance can be explained is that Hepworth and Henshall had a joint ownership in the machine before the foreign patents were applied for and before the agreement was made with Hanson.

" (8) Plans of the seamless machine marked with firm name.

" Certain plans or drawings of the seamless machine were offered in evidence, all of which had written upon them the firm name of John W. Hepworth & Co., in the handwriting of the defendant. It was claimed by the plaintiff's counsel that this was conclusive evidence that the defendant regarded the machine which the plans represented as belonging to the firm. The defendant, however, explained that he had written the

name of the firm on the drawings so that the pattern maker to whom they were sent might know to what shop they should be returned. This explanation seems so reasonable that the master is not disposed to give the circumstance the weight which the plaintiff claims for it, or, in fact, to count it at all as a corroborating circumstance.

" (9) Impressions of witnesses as to the ownership of the machine and patents.

" Four witnesses, who testified on behalf of the plaintiff, stated that, from conversations which they had at the office of John W. Hepworth & Co., they were led to believe that the automatic seamless machine was the joint property of Hepworth and Henshall.

" Joseph Hanson, in answering a question as to the ownership of the American patents, testified as follows : ' Q. Have you at any time heard anything said, by either Mr. Hepworth or Mr. Henshall, in the presence of the other, as to the ownership of the American patents ? A. I have often heard it said that " We won't." At one time there was something about it being sold to some company in the east, and they said : " We won't take less than $10,000," or something like that, " for it." There was some amount mentioned in it, but it was always " We." I always considered it was the firm machine.'

" Thomas A. Pierce testified : ' Q. Have you overheard any conversation, when Mr. Henshall was present, in which the ownership of the machine now in controversy was spoken of ? A. In a general way I have heard it spoken of as the machine belonging to the firm, or belonging to the concern.'

" Joseph Taylor testified : ' Q. Have you ever had any conversation with Mr. Henshall, or in his presence, in regard to the ownership of the seamless knitting machine that he was constructing ? A. No, sir ; nothing particular any more than this : I would come to the place and sit in the office and look at the work, saying : " This is nice work." I said : " What machine was that made on ? " " That was made on our machine." '

" Millard Hickey testified as follows : ' Mr. Henshall has given me several impressions in regard to that machine. It was in their office, probably in the year 1889 or 1890, I can't just say when, although I could bring it down to a few months

if I could get my letters. Mr. Henshall made a remark to me which strengthened a former impression I had about this seamless knitting machine, that everything about that place belonged to him and Jack. They divided up even. Everything was even. The occasion of it was in relation to a certain burglar alarm which they had interested themselves and put a little money in, and that they gave me to sell, I being in the hardware business at the time. They thought I might be able to sell the patent rights. They gave me a price. Mr. Hepworth gave the machine to me to sell. Mr. Henshall was there, and I asked him : "Sam, are you in this too?" He told me : "Yes; Jack and I are in everything, about. We share up even." That strengthened the impression I had that Mr. Hepworth was entitled to his half share in the knitting machine, which I knew was being built there, and had been patented.'

[" While it would not be proper to give to evidence of this character too much weight, yet it should not be wholly disregarded, in view of the probabilities of the case favoring the plaintiff, and the other corroborating circumstances being strongly in his favor.] [11]   It is certainly to be given more weight than similar testimony in behalf of the defendant, because the machine might very well be spoken of as Henshall's, even by Hepworth himself, in view of the fact that Henshall was the inventor and still the legal owner of it. There is no such reason why the machine should be spoken of as the firm's property, if, in fact, it was owned by Henshall alone.

" 6. Defendant's proof.

" (*a*) Henshall's testimony. The defendant's testimony is directly contradictory to that of the plaintiff in all substantial matters relating to the case. He testified that in October, 1886, Hepworth came to his house and they went upstairs to a room in the third story, where the seamless machine was kept. He describes the interview relating to the partnership agreement as follows : ' He (meaning Hepworth) asked me in this way. He says : " If I can get shut of my partners " (the word he made use of) " will you go with me?" We walked across the room, the machine was at the window, and we walked across the room; and he was just about going and I says to him : " What do you mean? Do you mean for me to bring

that machine in the business?" He says: "No; I do not want your machine. It is you I want." He says: "You give me your promise." Q. You would not give him your promise at that time? A. No, sir. I would not give him any promise. He says: "I do not know that I can get shut of them." These were about the words he used. I says: "You can see what you can do with them, and then you can let me know." He testified that subsequently he agreed to go into partnership with Hepworth on the terms stated, but that the machine had nothing to do with the partnership, and that he retained his individual ownership in it. He explained that the expenditures made on the machine in the way of wages, fees and payments for patterns were to be paid by him personally, and that he supposed that these items had been charged against his personal account. He further stated that he never looked at the books, and knew nothing of what was in them, except from general statements made to him from time to time by the bookkeeper.

["A careful examination of this testimony shows that it lacks coherence, that it is in parts contradictory, and that its reasonableness and probability may be justly questioned.] [12] It is furthermore directly contradicted in some of its parts by a number of witnesses. Mr. Henshall's statement that he never saw or examined the books is contradicted by Mr. Winkler, the bookkeeper, who testified that Henshall looked over the books from time to time, and saw them. Mr. Winkler also flatly contradicts Henshall's account of a conversation which occurred between them at Henshall's house. Henshall's statement that he objected to Hepworth's going to Europe in 1890, is contradicted by Messrs. Paine, Hunter, Hickey, Whitman, Allen and Drake. His statement of what occurred at an interview at an attorney's office, in regard to an agreement which he proposed to make with John H. Bishop, is directly contradicted by Mr. Bishop himself. He is even contradicted by his own wife, who stated that at the conclusion of the interview with Hepworth, described by Henshall, that her husband said: 'All right; now we have an understanding;' while Henshall testified that he would not give Hepworth any promise at that time.

"The probabilities are all against the defendant's story. It

seems almost incredible that a partner should go on from year to year without ever looking at the firm's books or seeking to know what the firm was worth, and that, when large expenditures were being constantly made on his private account, he should not know how these expenditures were treated in the books of the firm. There is a significant circumstance in the case which tends to show that the defendant did know that the expenditures made on account of the seamless machine were not charged to his private account. In the spring of 1890, when Mr. Hepworth was in Europe and after the quarrel between the partners had begun, the defendant directed the bookkeeper to enter a charge of $17.00, paid out on account of the seamless machine, to his private account. It seems very clear that an entry of that kind, made at that late date, was an attempt to manufacture evidence for future use, and that it indicated a knowledge of the exact state of the firm's books.

" (*b*) Defendant's corroborative proof.

" (1) Mrs. Henshall's testimony. The defendant's testimony relies for its chief support on that of Mrs. Henshall. The testimony of this witness, however, is not of such a character as to invite confidence. Mrs. Henshall described the interview between her husband and Hepworth as follows : ' It was in October, I should suppose, six to eight weeks before they went together in business. It was a week-day, and towards noon. Mr. Hepworth was about leaving the house, and the men came out of the third story front room, which my husband used for a workshop, and Mr. Hepworth was about leaving, and he halted in the doorway. . . . My husband pointed in to this machine and said to him: " John, do you mean for this machine to enter into this partnership ? " Mr. Hepworth answered and said: " No, no ; I don't want your machine. I want you. It is you I want." " All right," replied my husband ; " now we have an understanding. " '

" The trouble with this witness is that she attempts to be too accurate. She describes with the utmost precision minute details which it is in the highest degree improbable that anyone could remember after so long a time. She further puts into Mr. Hepworth's mouth the exact words which Mr. Henshall also ascribed to him. It is, of course, possible that two persons may be able to remember a sentence containing four-

teen words which another person has casually spoken and be able to repeat the sentence accurately after the expiration of five years, but it does not seem probable. Mrs. Henshall repeats six times the following sentences: "No; I don't want your machine. I want you. It is you I want." Mr. Henshall had already testified, and had repeated the same sentence several times.

["Mrs. Henshall's testimony not only seems to lack plausibility, but is also contradicted in two essential particulars. First: It is contradicted by her husband, who testified that he would not give Hepworth any promise at the interview described, while Mrs. Henshall testified that her husband said: 'All right; now we have an understanding.' Second: Mrs. Henshall testified that the conversation, which was overheard, was conducted in a loud voice, because Mr. Hepworth was deaf, and that he had told her he was deaf in one ear. Joseph Hanson, Millard Hickey and Alma Taylor testified that Hepworth did not become deaf until a year after the partnership between him and Henshall was formed.] [18]

"(2) James M. Beatty's testimony.

"A witness for the defendant, named Beatty, testified that at the time Hepworth was entering into his new partnership he talked with Beatty on several occasions and made of him a confidant, but that nothing was ever said in these conversations about Henshall's machine, or was any allusion made to anything else than Henshall's skill and ability as a machinist. In view of Hepworth's intimacy with Hill and Beatty's manifest antagonism to the latter, it is very possible that the intimacy claimed by Mr. Beatty was not so close as to invite the fullest confidence from Hepworth. But, however this may be, Beatty's testimony affords at the most merely negative corroboration of the defendant.

"(3) Failure of Hepworth to demand an assignment of his interest in the patents.

"It was strenuously urged by the defendant's counsel that the plaintiff's failure to demand an assignment of his interest in the patents for over four years was conclusive that he had no interest in them. This might be a fair argument if the machine had been perfected and all the patents obtained which were necessary to complete it. As a matter of fact, during the

whole continuance of the partnership until the bill in this case was filed, the defendant was continuously at work upon the machine, and it has not as yet been either perfected or completed. The plaintiff might very well wait until the work on the machine was finished, and the final patents obtained, before he asked for an assignment of his interest.

" (4) Inadequacy of the reason alleged for not referring to the patents in the partnership articles.

" The only reason alleged by the plaintiff why the machine was not referred to in the partnership articles was that the defendant objected, because, if it was placed in the articles, it would be necessary to have the patents issued at once, and he would thereby be robbed of about a year of their life. The machine might have been referred to in the articles of the partnership, either as the consideration upon which the articles were signed, or as the assets which the defendant was to put in as his share of the capital stock. It was certainly unbusinesslike not to refer to it. The reason given for the exclusion is not a satisfactory one, and if there were more in the defendant's case than there is, it might add additional weight as a corroborating circumstance. [On the other hand, it might possibly be suggested that the very inadequacy of this reason adds weight to the plaintiff's testimony,] [20] for if his story is wholly manufactured, he would have probably devised some more plausible excuse for the exclusion of the machine.

" (5) Impressions of witnesses as to the defendant's ownership of the machine.

" A number of witnesses testified that from conversations which they had with the plaintiff, they were under the impression that the machine and patents were owned by the defendant alone.

" John Blood testified as to a conversation which he had with the plaintiff and defendant at Atlantic City. He said: ' From my best recollection, and from the general impression I had at the time, so far as I can recollect, was that the machine belonged to Mr. Henshall; that he was the inventor and owner of that machine. I would not like to positively swear that. Q. Did you infer that from what was said there in the presence of John W. Hepworth? A. I did. That was my impression. I might be all wrong, however.'

" Mr. Eldridge, a member of the bar and a patent attorney, who was consulted about the machine, testified as follows : ' I never had any doubt but that it was his machine. There was nothing ever to raise any doubt in my mind. When I went there to see it it was in this room. It was locked, and Mr. Henshall unlocked the door, and we went in and closed the door, and we looked at the machine and talked about it. Then we came out, and he closed the door behind him. Q. Did he give you to understand it was his machine ? A. Yes, sir; always.'

" Edward E. Kilburn testified that he went to the office of John W. Hepworth & Co. on some business connected with the seamless machine; that Mr. Henshall was out at the time, and Mr. Hepworth told him that he would have to wait until Henshall returned. The witness was asked what Hepworth gave him to understand about the machine. He answered: ' The language I could not testify to. The understanding I got from him was that it was Mr. Henshall's machine. From the whole conversation that was the understanding I had in regard to it, but just the language used I could not testify to.'

" Harry Smith, a solicitor of patents with Howson & Howson, testified as to what occurred when the foreign patent was taken out. He stated that it had always been his understanding that Henshall was the owner of the United States patent.

" Harry C. Rightmire testified as follows : ' Q. Did you have any conversation about this machine with John W. Hepworth ? A. Not in particular. But whenever the machine came up Mr. Hepworth always said it was Sammie's machine.'

" While there is no reason to doubt the statements of these five witnesses, their testimony is by no means conclusive as to the defendant's exclusive ownership of the machine. Everybody knew that Henshall was the inventor of the machine, and the witness very probably knew that the patents had been taken out in his name. Mr. Eldridge and Mr. Smith certainly had this information. The private arrangement between the plaintiff and defendant was not so well known, and anyone who was ignorant of it might very readily have gained the impression that the machine belonged exclusively to the defendant.

" 7. Conclusion.

" Upon careful consideration of the whole case, and having

a due regard for the apparent credibility of the witnesses, and of the probabilities of the case, the master is of opinion that the plaintiff has sustained the averments of the bill by his own testimony and sufficient corroborating circumstances, and that the plaintiff's proof is sufficient without taking into consideration in any way the testimony of William Hill. The master therefore finds as a fact, that it was orally agreed between the plaintiff and defendant in consideration of entering into the articles of partnership of November 30, 1886, that the plaintiff should be the owner of a one-half interest in the automatic seamless knitting machine owned by the defendant, and the letters patent which protect the machine. The master is therefore of the opinion that the prayers of the bill should be granted, and recommends the following form of decree:

" 1. That a perpetual injunction issue enjoining and restraining the said Samuel Henshall from assigning, selling or in any way alienating or disposing of more than a one-half interest in the automatic seamless knitting machine, and in the various letters patent referred to in the third and fourth articles of plaintiff's bill.

" 2. That the said Samuel Henshall assign to the said John W. Hepworth a one-half interest in said automatic seamless knitting machine and in the letters patent Nos. issued, and in all improvements in said machine and in all letters patent which may hereafter be granted for improvements in said machine.

" 3. That the defendant pay all the costs of the case."

Exceptions to the report, among others to the findings inclosed in brackets above, were overruled, and a decree entered in accordance with the recommendation of the master.

*Errors assigned* were in overruling exceptions and in entering decree as above, quoting exceptions and decree.

*H. B. Amerling* and *Wm. W. Wiltbank, H. W. Amerling* with them, for appellant, cited: On the question of the sufficiency of the evidence: Odenbaugh v. Bradford, 67 Pa. 101; Barclay's Ap., 3 Walker, Pa. 230: Vandegrift v. Herbert, 3 C. E. Green, 466; Eaton's Ap., 66 Pa. 483; Audenreid v. Walker, 11 Phila. 183; Nulton's Ap., 103 Pa. 286; Thomas v. Loose, 114 Pa. 35; Juniata Building Association v. Hetzel, 103 Pa.

507; Wodock v. Robinson, 28 W. N. 288: Phillips v. Meily, 106 Pa. 536. On the question of power of the court to decree specific performance of a contract to assign an interest in a patent: Aspinwall Manufacturing Co. v. Gill, 32 Fed. R. 697; Pope Manufacturing Co. v. Gormully, 144 U. S. 244; Hapgood v. Rosenstock, 23 Fed. R. 86; Binney v. Annan, 107 Mass. 94: Adams v. Messinger, 147 Mass. 185; Somerby v. Buntin, 118 Mass. 279; Searle v. Hill, 73 Iowa, 367; Pitts v. Hall, 3 Blatchf. 201; Dunham v. R. R., 7 Biss. 223; Parkhurst v. Kinsman, 6 N. J. Eq. 608; Vose v. Singer, 86 Mass. 226; Clum v. Bruer, 2 Curtis, 506; Gates v. Fraser, 9 Ills. Ap. 624; Mathers v. Green, 1 L. R. Ch. Ap. 29.

*John G. Johnson,* for appellee, cited: On question of right to exclude cross-examination of witnesses as to bias: Wh. Ev., 3d ed., § 408; Greenl. Ev., 14th ed., § 450; Cameron v. Montgomery, 13 S. & R. 128; Ott v. Houghton, 30 Pa. 451; Batdorf v. Bank, 61 Pa. 179. On question of sufficiency of evidence to support the bill: Newbold's Ap., 80 Pa. 331; Thomas v. Loose, 114 Pa. 35; Campbell v. Patterson, 95 Pa. 454; Ferguson v. Rafferty, 128 Pa. 337. On question of jurisdiction: Hapgood v. Rosenstock, 23 Fed. R. 86; Satterthwait v. Marshall, 4 Del. Ch. 337; Robinson, Patents, § 1288; Binney v. Annan, 107 Mass. 94; Adams v. Messinger, 147 Mass. 185; Searle v. Hill, 73 Iowa, 367; Reese's Ap., 122 Pa. 392; Regan Vapor-Engine Co. v. Pacific Gas-Engine Co., 49 Fed. R. 68; Littlefield v. Perry, 21 Wal. 226; Somerby v. Buntin, 118 Mass. 279.

OPINION BY MR. JUSTICE STERRETT, February 13, 1893:

This contention, in the court below, hinged mainly on the alleged oral agreement recited in the third paragraph of the bill.

Among other things, the bill avers, in substance, that, on November 30, 1886, plaintiff and defendant entered into a written agreement of copartnership, for the term of five years, for the purpose of carrying on the business of machinists in the name of John W. Hepworth & Co. The defendant had theretofore applied for letters patent for a seamless knitting machine, not then completed. Those letters were issued July 31, 1888, and the fees therefor were paid by the firm. Other letters, for improvements on said machine, etc., were issued March 20,

1890, and August 8, 1890.   During a considerable portion of
the time, after formation of said partnership, defendant Hen-
shall was engaged, with the assistance of employees of the firm
and aid of the firm's capital, in completing and making im-
provements on said machine.   The oral agreement, above re-
ferred to, is set forth in the third paragraph of the bill thus:

"It was orally agreed between the plaintiff and the defend-
ant, in consideration of entering into said articles of agreement
and in consideration of other matters, that the plaintiff should
be the owner of one half interest in said machine and in the
letters patent that should be granted therefor, and in all
the improvements in said machine and in all letters patent
which should be thereafter granted for improvements in said
machine."

It is further averred that the defendant refused to assign
said interest to the plaintiff as provided for in said oral agree-
ment.   The prayers are for (a) an injunction restraining de-
fendant from assigning or otherwise disposing of a one half
interest in said machine and letters patent; (b) a decree or-
dering him to assign to the plaintiff a one-half interest in
said machine and letters patent; and (c) general relief.

In his answer defendant admits the partnership, but ex-
pressly denies "ever having entered into an agreement, either
at the time, or before, or after formation of said partnership
by virtue of which the plaintiff was to have one half, or any
interest whatever, in any of said machines, improvements
thereon or letters patent."

The burden of overcoming this responsive answer and mak-
ing full proof of the alleged oral agreement according to equity
practice, was thus cast on the plaintiff.   He assumed that bur-
den, and succeeded in proving to the satisfaction of the learned
master and court below that said alleged agreement was made.

After a careful review and properly discriminating consid-
eration of all the testimony bearing on the subject, the learned
master states his conclusion thus:   "that the plaintiff has sus-
tained the averments of the bill by his own testimony and suffi-
cient corroborating circumstances, and that the plaintiff's proof
is sufficient without taking into consideration in any way the
testimony of William Hill.   The master therefore finds as a
fact that it was orally agreed between the plaintiff and de

fendant, in consideration of entering into the articles of co-partnership of November 30, 1886, that the plaintiff should be the owner of a one-half interest in the automatic seamless knitting machine, owned by the defendant, and the letters patent which protect the machine."

This conclusion is so fully vindicated by the master in his clear and convincing report that further discussion of the testimony is deemed unnecessary. An examination of the proceedings before him fails to disclose any error in his findings of fact. The only criticism that was suggested by that examination is his ruling in relation to cross-examination of witnesses called to impeach the credibility of William Hill, one of plaintiff's witnesses. Speaking for myself, he appears to have held plaintiff to an unduly rigid rule in that regard. In such cases, it is not only due to the impeached witness, but also to the party who called him, that some latitude should be allowed in cross-examination of the impeaching witnesses, excluding, however, such details as would create collateral issues; but of that the defendant, of course, does not complain.

The oral agreement, established by the proofs, does not, in terms, entitle the plaintiff to an interest in improvements on the machine other than those made during the existence of the copartnership aforesaid; nor do we think that any other or further right is implied. Construed in the light of the relation existing between the parties when the agreement was made and their subsequent course of dealing in relation to the subject, we are of opinion that plaintiff's claim should be restricted to an undivided one-half interest in the machine, and a like interest in all improvements made thereon during the continuance of the partnership, and in the letters patent, protecting the same, whether applied for or granted before or after the expiration of said partnership. It therefore follows that the decree should be modified to read thus:

1. That a perpetual injunction issue enjoining and restraining the said Samuel Henshall from assigning, selling or in any manner disposing of more than a one undivided half interest in the automatic seamless knitting machine, and in the various letters patent referred to in the third and fourth paragraphs of plaintiff's bill.

2. That the said Samuel Henshall assign to the said John W.

Hepworth a one undivided half interest in said automatic seamless knitting machine and in the letters patent numbers 386,819, 386,820 and 386,821, issued July 31, 1888, and in all improvements in said machine made prior to November 30, 1891, and in all letters patent for said machine and for said improvements whether applied for or granted before or after said last mentioned date.

As thus modified, the decree is affirmed and the appeal dismissed ; and it is further ordered that the costs of this appeal be paid by the appellee.